515 F.2d 301
 10 Fair Empl.Prac.Cas. 1063,
10 Fair Empl.Prac.Cas. 239,
9 Empl. Prac. Dec. P 9997
EQUAL EMPLOYMENT OPPORTUNITY COMMISSION et al., Plaintiffs-Appellees,
v.
The DETROIT EDISON COMPANY, Defendant-Appellant.
EQUAL EMPLOYMENT OPPORTUNITY COMMISSION et al., Plaintiffs-Appellees,
v.
LOCAL 17, INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS,
Defendant-Appellant.
Willie STAMPS et al., Plaintiffs-Cross-Appellants,
v.
The DETROIT EDISON COMPANY et al., Defendants-Cross-Appellees.
EQUAL EMPLOYMENT OPPORTUNITY COMMISSION et al., Plaintiffs-Appellees,
v.
LOCAL 223, UTILITY WORKERS UNION OF AMERICA, Defendants-Appellants.
 Nos. 74-1007 to 74-1009 and 74-1675.
 United States Court of Appeals,
Sixth Circuit.
 March 11, 1975.
As Amended May 16, 1975 by Panel after Denial of Rehearing en Banc.
 
 William P. Rogers, Rogers & Wells, New York City (argued), for defendant-appellant-cross-appellee Detroit Edison Co.; Richard Ford, Leo I. Franklin, James E. Brenner, Fischer, Franklin & Ford, Detroit, Mich., Leon S. Cohan, James F. Ward, Detroit, Mich., of counsel.
 William B. Gould, Professor of Law, Stanford, Cal. (argued), for plaintiff-appellee-cross-appellant Willie Stamps and others; Roger E. Craig, Gene Farber, Detroit, Mich., Melvin L. Wulf, A. C. L. U., New York City, Professor John de J. Pemberton, Jr., University of San Francisco Law School, San Francisco, Cal., of counsel.
 Beatrice Rosenberg (argued), William A. Carey, Joseph T. Eddins, Jr., Washington, D. C., for plaintiff-appellee EEOC.
 Rolland R. O'Hare (argued), Marston, Sachs, O'Connell, Nunn & Freid, Detroit, Mich., for defendant-appellant-cross-appellee Local 17.
 William M. Mazey (argued), Rothe, Mazey & Mazey, Detroit, Mich., for defendants-cross-appellees Local 223.
 Before PECK, MILLER and LIVELY, Circuit Judges.
 LIVELY, Circuit Judge.
 
 
 1
 Two actions seeking relief from alleged racial discrimination in the employment practices of The Detroit Edison Company (hereafter Edison) were consolidated for trial in the district court. In one action, the United States was the plaintiff[1] and in the other the plaintiffs were three black employees of Edison. In addition to Edison, Local 17, International Brotherhood of Electrical Workers (hereafter Local 17) and Local 223, Utility Workers Union of America (hereafter Local 223) were named defendants in both actions. The Association for the Betterment of Black Edison Employees (hereafter the Association) was also named a plaintiff in the action brought by the private plaintiffs, but was dismissed for lack of standing by an order of the district court. The private plaintiffs filed suit as a class action, and in their complaint described the class as follows: "The members of the class are all Black citizens whom Defendant Detroit Edison has refused or discharged from employment, discriminated against with respect to compensation, terms conditions and/or terms or (sic) employment; and/or otherwise segregated, classified, or who were otherwise deprived of employment opportunities, because of their race or color." The complaint stated that the private plaintiffs sued "individually and, on behalf of all other persons similarly situated."
 
 
 2
 Under the heading "Factual Allegations" the complaint listed a number of policies, practices, customs and usages of Edison which were alleged to discriminate against the plaintiffs and members of the class with respect to employment, compensation, terms and conditions of employment. Included in this listing were the use of departmental or group seniority, the use of arbitrarily long and non-job-related apprentice programs, the use of tests which are unrelated to employment and disproportionately exclude blacks from employment opportunities, the use of employment interview practices which exclude blacks from employment for non-job-related reasons or result in inferior compensation and assignment of blacks to low-opportunity jobs, and the claim that the defendants "have established a reputation in the Black community for discriminating against individuals in employment because of race or color." The involvement of the two locals in the discriminatory practices was alleged to have consisted of negotiating agreements which provided for departmental or group seniority rather than company-wide seniority to the detriment of black employees and the failure to object to other discriminatory practices of Edison as previously outlined. It was alleged that the locals have "both breached their duty of fair representation and discriminated against Black persons because of race and color." There then followed a recitation of alleged discriminatory acts which had been practiced upon the three named private plaintiffs.
 
 
 3
 The complaint concluded with a statement of the legal violations involved in the discriminatory acts and practices alleged. It was claimed that all defendants had violated the provisions of the Civil Rights Act of 1964, 42 U.S.C. § 2000a et seq., the Civil Rights Act of 1866, 42 U.S.C. § 1981 and the Labor Management Relations Act, 29 U.S.C. §§ 151 and 185. The relief sought was a permanent injunction against the continued use of "discriminatory hiring and promotional practices which exclude Black workers and the use of departmental or job group seniority systems"; a declaration that the practices and procedures outlined in the complaint were unlawful; an award of back pay to all members of the class injured by unlawful practices; "and any other additional and alternative relief as may appear to the Court to be equitable and meet." In an amended complaint filed nearly a year and a half after the original complaint, the private plaintiffs alleged that there had been retaliation and intimidation against them since the filing of the original complaint and prayed for punitive damages of $10,000,000.
 
 
 4
 The complaint of the United States sought a preliminary and permanent injunction against alleged discriminatory practices upon the allegation that Edison "engaged in acts and practices that limit, segregate, classify and otherwise discriminate against its black employees and black applicants for employment in ways that deprive or tend to deprive them of employment opportunities and adversely affect their status as employees because of their race . . .." The specific practices of Edison referred to in the government complaint were assignment of blacks to low-progression jobs, promotion by departmental and job seniority, the use of non-validated standardized tests for promotion, discrimination in hiring and recruitment practices, use of non-validated standardized tests for employment entry and the company's refusal to correct its practices. The complaint also alleged that the provisions of the collective bargaining agreements with the two locals concerning promotion, demotion and transfer are discriminatory and that the acts and practices of Edison and the locals constitute "a pattern and practice" which denies black persons the full enjoyment of their right to equal employment opportunities in violation of Title VII of the Civil Rights Act of 1964. All of the allegations of the complaints were put in issue by denials of the defendants. The motions of the defendants for jury trials in both cases were stricken and the amended complaint of the private plaintiffs seeking punitive damages against Edison was "conditionally" allowed.
 
 
 5
 Prior to trial, a stipulation was filed which showed that on April 24, 1972, Edison had 10,630 employees of whom 832 were black. In supervisory positions there were 12 blacks and 1,099 whites; in professional and technical jobs there were 73 blacks and 1,785 whites. This stipulation further showed the distribution by departments in the various seniority groupings listed in the bargaining agreements of Local 17 and Local 223. Numerous exhibits were filed by the parties, particularly the government and Edison. More than 50 witnesses testified in the trial before the court which consumed 28 trial days over a period of approximately two months.
 
 
 6
 The court included a "summary" of its findings and conclusions in its opinion and order in addition to specific findings of fact and conclusions of law. The summary included the following statements:
 
 
 7
 The evidence was overwhelming that invidious racial discrimination in employment practices permeates the corporate entity of The Detroit Edison Company. The Court finds as proven facts that upward mobility of blacks presently employed at Detroit Edison is almost non-existent, and that qualified potential black employees are refused employment or refrain from applying for employment because of the Company's reputation in the Black Detroit Community for racial discrimination. The Company has taken the position that if any inequities exist between blacks and whites at Detroit Edison, such inequities have accidentally evolved and have not resulted from deliberate discrimination. While this Court believes that the law would require it to find that Detroit Edison has violated the law if it has, without intent to discriminate, fostered practices which have resulted in a racially discriminatory impact, the evidence in this case demonstrates that the Company's discrimination has been deliberate and by design. (Footnote omitted.)
 
 
 8
 It is the conclusion of the Court, in light of the evidence adduced, that the Company is refusing to acknowledge the obvious and has therefore adopted an intractable position.
 
 
 9
 The long and short of the evidence with respect to the Defendant Unions is simply that the Unions have promoted the interests of its white members without regard to the interests of its black members, and have ignored the plight of the black members in gaining the equal employment opportunity that is their due under the Constitution and laws of the United States.
 
 
 10
 The district court opinion, which appears at 365 F.Supp. 87, contains detailed findings of fact and conclusions of law and an order which provides for back pay and requires specific affirmative actions designed to eliminate the effects of past discriminatory practices and to prevent future racial discrimination. The decree concludes with a provision for the payment by "defendants" to private plaintiffs of reasonable attorneys fees and the direction that Edison pay to the plaintiffs $4,000,000 in punitive damages and Local 223 pay $250,000 in punitive damages. The recipients of these damages are stated to be "plaintiffs, including both those individually named as plaintiffs and those comprising the class represented by the named plaintiffs but excluding the United States . . .." It further provides that the court will issue a subsequent order directing the manner in which the money is to be disbursed to the plaintiffs. The award of punitive damages was based on a finding of malice on the part of Edison and Local 223.
 
 
 11
 All defendants have appealed and the private plaintiffs have appealed from the order dismissing the Association as a plaintiff. The order of the district court from which the cross appeal was taken is affirmed. The Association did not allege either injury to its members or that it had suffered an injury apart from any suffered by its members as a result of the acts of the defendants. Absent an allegation of injury, the Association has no standing to sue. Sierra Club v. Morton, 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972). The issues raised by the defendants-appellants will be dealt with individually as required.
 
 PUNITIVE DAMAGES
 
 12
 The relief provisions of Title VII contained in Section 706(g) of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-5(g), do not specifically authorize an award of either compensatory or punitive damages for discrimination in employment practices. Back pay in Title VII cases is considered a form of restitution, not an award of damages. Since restitution is an equitable remedy a jury is not required for the award of back pay. Johnson v. Georgia Highway Express, Inc., 417 F.2d 1122, 1125 (5th Cir. 1969). Damages are a legal, not an equitable remedy, and the Seventh Amendment requires a jury trial in a statutory action "if the statute creates legal rights and remedies, enforceable in an action for damages in the ordinary courts of law." Curtis v. Loether, 415 U.S. 189, 194, 94 S.Ct. 1005, 1008, 39 L.Ed.2d 260 (1974). All defendants demanded a jury trial in the present case and it was denied by the court. Furthermore, in dealing with its power to award punitive damages in this case, the court referred to the 1972 amendment to Section 706(g) which provides:
 
 
 13
 (T)he court may enjoin the respondent from engaging in such unlawful employment practice, and order such affirmative action as may be appropriate, which may include, but is not limited to, reinstatement or hiring of employees, with or without back pay . . . or any other equitable relief as the court deems appropriate.
 
 
 14
 We find no authority in the quoted language for the award of punitive damages. We know of no authority which holds that the awarding of punitive damages is equitable relief. The catchall phrase, "other equitable relief as the court deems appropriate," does not stand alone. It is limited, under the construction doctrine of ejusdem generis, to relief of the same kind as that specifically enumerated. While affirmative action may not be limited to the reinstatement or hiring of employees with or without back pay, we believe that it is limited to relief of the same general kind, that is, equitable relief in the form of restitution.
 
 
 15
 We are not unaware of arguments which have been made in favor of allowing punitive damages in Title VII cases. See Developments in the Law Employment Discrimination and Title VII of the Civil Rights Act of 1964, 84 Harv.L.Rev. 1109, 1261 (1971); Implying Punitive Damages in Employment Discrimination Cases, 9 Harv.Civ.Rights-Civ.Lib.L.Rev. 325 (1974). In two recent district court cases, it has been held that punitive damages may not be allowed in Title VII actions. See Van Hoomissen v. Xerox Corp., 368 F.Supp. 829 (N.D.Cal.1973), and Howard v. Lockheed-Georgia Co., 372 F.Supp. 854 (N.D.Ga.1974). In Van Hoomissen, the court considered the somewhat sketchy legislative history with respect to Section 706(g) and concluded that Congress did not intend to permit an award of punitive damages in Title VII cases. We have been cited to nothing in the legislative history which would compel a different determination.
 
 
 16
 In the Howard case, the court found that Congress would have made clear any intention to authorize compensatory and punitive damages in Title VII cases. In reaching this conclusion, the court noted that Title VIII of the Civil Rights Act of 1964 was amended in 1968 so that Section 812 thereof specifically provides that "(t)he court may grant as relief, as it deems appropriate, any permanent or temporary injunction, temporary restraining order, or other order, and may award to the plaintiff actual damages and not more than $1,000 punitive damages . . .." Having set forth with such particularity the remedies permitted under the portion of the Civil Rights Act relating to discrimination in housing, it is unlikely that Congress would, in amending the relief provisions of Title VII four years later, fail to specify the award of punitive damages as a measure of relief authorized if that was its intention. The difference between the language of Section 706(g) and Section 812 was noted by Mr. Justice Marshall in Curtis v. Loether, supra, 415 U.S. at 197, 94 S.Ct. 1005. We also agree with the reasoning in Howard v. Lockheed-Georgia Co., supra, that a private plaintiff who sues under both Title VII and Section 1981 does not enlarge his right to relief beyond that authorized by Title VII. Section 1981 contains no provision for relief by way of damages or otherwise. When it is joined with another statutory right of action such as Title VII which specifies broad equitable remedies for those who have been injured by violation thereof, there is no justification for enlarging those remedies to include legal relief by way of punitive damages on the basis of Section 1981.
 
 
 17
 In oral argument, counsel for the private plaintiffs relied particularly on two recent cases as supporting the view that punitive damages may be awarded in Title VII cases. We have read and considered Evans v. Sheraton Park Hotel, 503 F.2d 177 (D.C.Cir.1974), and Waters v. Heublein, Inc., 8 F.E.P. Cases 908 (N.D.Cal.1974), and find them unpersuasive. In neither opinion is there any analysis of Section 706(g) and primary reliance in Waters v. Hueblein was placed on the district court opinion in the case which we are presently considering. We note that the government did not seek punitive damages in its complaint, nor did it join in the prayer of the amended complaint of the private plaintiffs. In fact, expressing doubt as to the availability of punitive damages in an action such as the present one, government counsel requested that its case be severed from that of the private plaintiffs in the event the district court should empanel a jury to hear the punitive damages issue or determine to award punitive damages without a jury.
 
 THE CLASS ACTION
 
 18
 The suit of the private plaintiffs was filed as a class action. Each of the individual plaintiffs was an employee of Edison at the time the complaint was filed, and had been so employed for varying periods prior thereto. The class which these three plaintiffs claimed to represent included all black citizens whom Edison "had refused or discharged from employment" or had discriminated against with respect to employment opportunities or employment practices. The court did not enter an order as such making the determination required by Rule 23(c)(1), Fed.R.Civ.P.:
 
 
 19
 (1) As soon as practicable after the commencement of an action brought as a class action, the court shall determine by order whether it is to be so maintained. An order under this subdivision may be conditional, and may be altered or amended before the decision on the merits.
 
 
 20
 The original complaint was filed on May 17, 1971 and on January 26, 1973, the court entered a "Memorandum Order Granting Motion to Dismiss Party Plaintiff." In this memorandum order, the court considered the previous motions of the defendants to dismiss the Association as a party plaintiff in the private action. It concluded the order with the following language:
 
 
 21
 It is the Court's conclusion that the plaintiffs remaining in the law suit, Willie Stamps, James Atkinson, Darney Stanfield, and the United States Government, will adequately protect the interests of the class on whose behalf the law suit is brought, to wit: all black Edison Employees.
 
 
 22
 Shortly thereafter the trial began and the class action issue was not dealt with in any further order of the court before the decision on the merits. In its decision on the merits as set forth in the court's opinion and order of October 2, 1973, the district court referred to the class represented by the individual plaintiffs as "all black citizens whom defendant Detroit Edison Company has refused to hire and has discharged from employment, discriminated against with respect to compensation, terms conditions and/or terms of employment; and/or otherwise segregated, classified, or otherwise deprived them of employment opportunities because of their race or color." Further, the order provided that:
 
 
 23
 The affected class for the purposes of the hiring and transfer provisions of this decree shall be deemed to consist of all black individuals who applied for employment with defendant Detroit Edison Company subsequent to July 2, 1965, and were rejected and black employees who would have applied but for defendant's discriminatory hiring policy and/or black employees who were hired prior to the date of the decree and who were actively employed at any time after July 2, 1965, and who were at any time regular employees in the job classifications referred to above as low opportunity jobs.
 
 
 24
 The order then went on to include the means by which Edison was required to notify the members of the affected class "who were refused hire or who would have been refused hire at Detroit Edison Company between July 2, 1965, and the date of the decree . . .."
 
 
 25
 This court has held that the provisions of Rule 23(c)(1) are mandatory and that the court is required to enter an order of determination whether requested by the parties or not. Garrett et al. v. City of Hamtramck,503 F.2d 1236 (6th Cir. 1974). In the same case, we held that where the district court enters an order which has the effect of defining a class and the parties proceed to trial on the basis of such a determination, the court may not, consistent with fairness or with the provisions of Rule 23(c)(1), amend the definition of the class at the time of its decision on the merits. We hold that the class represented by the individual plaintiffs in the private action consists of all black Edison employees.
 
 
 26
 Even if plaintiffs had sought a certification that the class which they represent includes rejected black applicants for employment by Edison and those black citizens who were deterred from applying because of Edison's reputation in the community, there is serious doubt that such representation would have been proper. Rule 23(a)(4) requires that "the representative parties will fairly and adequately protect the interests of the class." It is distinctly possible that persons who were rejected for employment or deterred from applying would have interests different from those black persons who were actually employed by Edison. It appears that in order to satisfy Rule 23(a)(4) at least two sub-classes would have been necessary to represent groups other than actual black employees of Edison and that individual plaintiffs having interests in common with the members of the two sub-classes would be required. See Oatis v. Crown Zellerbach Corp., 398 F.2d 496, 499 (5th Cir. 1968). We recognize that every Title VII action is in effect a class action and that a liberal construction should be given to the requirements of Rule 23(a)(2) and (3), and that there be questions of law or fact common to the class and that the claims of the representative parties are typical of those of the class. It is recognized that one purpose of Title VII is to root out an underlying policy of discrimination of an employer or a union regardless of how it is manifested. Nevertheless, though a broad definition of commonality of interests and typicality of claims is desirable, there remains a duty upon the court to consider carefully the requirement of fair and adequate protection in view of the serious consequences of res judicata in class actions. Developments, op. cit., 84 Harv.L.Rev. 1220-21 (1971). As Judge Godbold wrote in a concurring opinion in Johnson v. Georgia Highway Express, Inc., supra, 417 F.2d at 1125, a private plaintiff in the Title VII action must provide the district court with sufficient information so that it may "equate and balance what the appellant claims are the limits of the class against the tests of adequate representation, protection of the interests of the class, and manageability of the lawsuit." The private plaintiffs in the present case, did not by pleading or proof, sufficiently advise the court for it to define a class represented by these plaintiffs as including anyone but black employees of Edison.
 
 
 27
 The limitation of the class represented by private plaintiffs to actual employees of Detroit Edison does not necessarily deprive persons outside the class of the benefits of this action. The complaint of the government charged Edison with practices which, inter alia, discriminate against "black applicants for employment in ways that deprive or tend to deprive them of employment opportunities and adversely affect their status as employees because of their race." The complaint further charged that Edison discriminates against black persons in hiring and recruiting practices and in requiring them to pass standardized tests which have not been validated as a condition of employment. This complaint put in issue the hiring practices of Edison and the rights of applicants who were rejected for employment because of race. Furthermore, a large part of the evidence introduced in support of the government's case consisted of exhibits and other proof on the issue of discrimination in hiring or failing to hire black applicants. While neither the private plaintiffs nor the government introduced the testimony of actual applicants who were ultimately rejected for employment, a great deal of statistical evidence was admitted on the hiring issue. The district court properly considered the claim in the government case that black citizens had been rejected for employment and otherwise denied employment opportunities by Edison because of race.
 
 
 28
 As has been noted, the court also included in the class represented by the private plaintiffs those persons who would have applied for employment with Edison except for its reputation of not hiring blacks. Although the private plaintiffs pled that Edison had established a reputation in the black community for discriminating against applicants because of race or color, there was no allegation that this reputation actually deterred anyone from applying for employment. No witness testified that he would have applied for employment at Edison but was deterred because of its bad reputation. Several employees of Edison testified to a reputation for discrimination against blacks, but these were people who did not rely on the reputation and were accepted for employment. The government did not refer to this class in its complaint and requested no relief for it in its proposed findings of fact and conclusions of law. In oral argument, counsel for the government referred to this as an "amorphous" class and stated that if such a class existed it would only have been between 1965 and 1968. The government admitted that inclusion of such a class would create serious problems because the identification of individual members would be virtually impossible as would be a determination of the availability of openings for such persons.
 
 
 29
 The private plaintiffs assert that the failure of the district court to make a class action determination which included the two groups which we have excluded was immaterial. It is claimed that all parties tried the case on the basis of all three groups being included in the class and that the defendants are estopped to complain of the inclusion of all three in the remedial provisions of the judgment. If the case of the private plaintiffs had been tried alone there might be merit to this claim. However, the evidence concerning hiring procedures, rejections and even reputation was competent to prove the allegations of the government complaint. Its admission without specific objection on Rule 23 grounds was not sufficient to enlarge the class represented by plaintiffs to include non-employees of Edison.
 
 
 30
 We have carefully examined the cases relied upon by the private plaintiffs with respect to this issue. See Pettway v. American Cast Iron Pipe Co., 494 F.2d 211 (5th Cir. 1974); Bing v. Roadway Express, Inc., 485 F.2d 441 (5th Cir. 1973); Rodriguez v. East Texas Motor Freight, 505 F.2d 40 (5th Cir. 1974). Each of these cases dealt with a Rule 23 problem in a Title VII case, but none appears to have reached the court of appeals in exactly the posture of the present case. In Pettway, it is clear that the class included only current employees of the defendant and that hiring practices were never an issue. The "unidentified class members" referred to in quoted language from the court's opinion deals with the identification for back-pay purposes of individual members of the only class of persons represented in the case. It does not refer to identifying persons for the purpose of including them within a class. In Bing, there was no 23(c)(1) order, but the court of appeals determined that the class was a simple one consisting of current employees only, and that all parties knew and acquiesced in the makeup of the class during trial. In Rodriguez, the court dealt with a very complex case in which the district court found class action inappropriate. The court of appeals held that the district court is required to make an early class certification under 23(c)(1). The court of appeals then made an independent determination of the appropriateness of the class action claims and of whether the requirements of Rule 23(a) and (b) had been met. This is precisely what the present opinion indicates as an alternative ground for limiting the class to present employees of Edison in the event the order of January 26, 1973 had not been treated as a 23(c)(1) certification.
 
 TITLE VII VIOLATIONS
 
 31
 The record in this case supports the finding of the district court that there was a history of racial discrimination in the employment practices of Edison. These practices affected the hiring of blacks, as well as their initial placement and advancement after becoming employees. While many of the overt acts of discrimination shown in the record occurred prior to July 2, 1965 the effective date of the 1964 Act nevertheless the effects of earlier discriminatory practices clearly carried forward to the time of trial. The statistical evidence alone showing a disproportionately low number of black employees would be sufficient to support a finding of discrimination in hiring. Mabin v. Lear Siegler, Inc., 457 F.2d 806 (6th Cir. 1972). However, a great deal of evidence was produced of other practices of Edison which served to limit the number of black employees and to restrict the opportunities for advancement of those who were hired. The practice of relying on referrals by a predominantly white work force rather than seeking new employees in the marketplace for jobs was found to be discriminatory. The use of racial coding of applications and heavy reliance on subjective judgments of interviewers were found to discriminate against black applicants. Though Edison offered justification for its hiring practices, the findings are supported by substantial evidence.
 
 
 32
 With respect to placement and promotion, the evidence relating to Edison's testing program established the existence of practices and procedures which consigned black employees to low-opportunity jobs. In light of proven differences in the scores of black and white subjects, Edison failed to demonstrate a differential validity for its test batteries. Further, the court was justified in finding that none of the test batteries had been properly validated considering job performance, the fact that no blacks were involved in some testing, the use of relatively high cutoff scores on many of the tests and the fact that many had not been evaluated for an excessive period of time. Claims of validation studies by Edison which were unsupported by written records could properly be discounted. The court relied on exhibits in the government presentation to find that substantial numbers of blacks were held back though they had demonstrated qualifications for the jobs they sought which were superior to those of successful white bidders. The evidence was in conflict, but none of these findings may be held clearly erroneous.
 
 
 33
 The district court found that the system of departmental seniority which prevailed at Edison resulted in further discrimination against its black employees. The record supports this finding. In order to transfer to a high-opportunity line of progression in a different department an employee is required to forfeit all accumulated seniority and often must take a pay cut. Given the small number of blacks hired in the past, and the practice of assigning newly hired blacks to menial jobs, this seniority system has served to lock black employees into low-opportunity areas of work. When challenged, a seniority system which produces these results for members of a minority race, while protecting the status of those of the majority, must give way. Head v. Timken Roller Bearing Co., 486 F.2d 870 (6th Cir. 1973); United States v. Georgia Power Co., 474 F.2d 906 (5th Cir. 1973).
 
 
 34
 The seniority system, and many of the hiring practices of Edison, appear fair and objective when considered by themselves. However, a court must view all the practices challenged in a Title VII case in the light of their effect in operation, not in the abstract. As the Supreme Court pointed out in Griggs v. Duke Power Co., 401 U.S. 424, 431, 91 S.Ct. 849, 853, 28 L.Ed.2d 158
 
 
 35
 The Act proscribes not only overt discrimination but also practices that are fair in form, but discriminatory in operation. The touchstone is business necessity. If an employment practice which operates to exclude Negroes cannot be shown to be related to job performance, the practice is prohibited.
 
 
 36
 We have applied this principle many times in finding violations in practices and criteria, otherwise fair and neutral, which preserve or perpetuate the effect of past acts of overt discrimination. Sims v. Sheet Metal Workers, Local 65, 489 F.2d 1023, 1026 (6th Cir. 1973); Bailey v. American Tobacco Co., 462 F.2d 160, 162 (6th Cir. 1972); United States v. I.B.E.W., Local 38, 428 F.2d 144, 149-51 (6th Cir.), cert. denied, 400 U.S. 943, 91 S.Ct. 245, 27 L.Ed.2d 248 (1970). No showing of business necessity was made in the present case.
 
 
 37
 The two union locals argue that they did no hiring, rejecting, testing or promoting and should not be held responsible for any of Edison's acts of discrimination. It has long been settled that a union must attempt to protect its minority members from discriminatory acts of an employer. Steele v. L. & N. R.R., 323 U.S. 192, 199, 65 S.Ct. 226, 89 L.Ed. 173 (1944). This obligation requires a union to assert the rights of its minority members in collective bargaining sessions, and not passively accept practices which discriminate against them. Macklin v. Spector Freight Systems, Inc., 156 U.S.App.D.C. 69, 478 F.2d 979, 989 (1973). Acquiescence in a departmental seniority system which produces unequal treatment on the basis of race is sufficient to subject a union to liability under Title VII. Johnson v. Goodyear Tire & Rubber Co., 491 F.2d 1364, 1381 (5th Cir. 1974). Although charges of overt acts of discrimination were made only against Local 223, both it and Local 17 were properly held accountable for the natural consequences of a seniority system contained in all their agreements with Edison.
 
 THE REMEDY
 A. General
 
 38
 Edison argues that it no longer engages in discriminatory practices and that the record of recent years shows a sharp increase in the hiring of blacks. We are urged to follow the Eighth Circuit in Parham v. Southwestern Bell Telephone Co., 433 F.2d 421 (1970), where it was held that, in spite of past discrimination, no injunctive relief was necessary or appropriate in view of the great strides which had been made since the institution of an affirmative action program in 1967. Though the record in the present case reflects some corrective actions on the part of Edison in recent years, we are unable to conclude that the district court was clearly erroneous in finding that Edison's efforts had been largely unproductive. Counsel for Edison have also assured the court that the company is now under new management which is committed to equal employment opportunities. In United States v. I.B.E.W., Local 38, supra, the appearance of new leadership in a union was held not to justify withholding affirmative relief.
 
 
 39
 While concluding that an injunction was properly entered, the court must carefully examine other remedial provisions of the district court's order in light of the provisions of the Act and court opinions which have dealt with questions similar to those raised in this appeal. Counsel for the government suggested in oral argument that the decree must be "recast" for greater precision and clarity. We will consider separately those provisions which must be altered on remand.
 
 B. Back Pay
 
 40
 All black employees of Edison are eligible to be considered for back-pay awards. There was no claim of unlawful discharges in this case, but there may be former employees who have left the service of Edison and who should participate in the back-pay provisions of the decree as finally formulated. Although not included in the class represented by the individual plaintiffs, rejected black applicants for employment must be considered for back pay on the basis of the prayer for relief in the government complaint. United States v. Georgia Power Co., supra, 474 F.2d at 919-21. Not every black employee or rejected black applicant of Edison will automatically qualify for a back-pay award. But each such person should be given an opportunity to establish his entitlement. The criterion is that the wages be "properly owing" to those who are ultimately awarded back pay. Id. at 922. Hearings to determine eligibility and amounts of back pay may be held by a special master. See United States v. Masonry Contractors Ass'n, 497 F.2d 871, 876 (6th Cir. 1974).
 
 
 41
 It will obviously be impossible to reconstruct the employment history of each black employee and of each rejected black applicant as it would have been if that person had not been subjected to discrimination. There are too many imponderables for an exact equalization, but the object of a back-pay award is to effect restitution. Therefore, the goal is to determine for each eligible employee as nearly as possible the difference between the highest earnings for the jobs he would have bid on and qualified for if a non-discriminatory system of seniority, job posting and bidding and transfer had been in effect. The difference between the amount so determined and the actual earnings of each employee should constitute his back-pay award. Bowe v. Colgate, Palmolive Co., 489 F.2d 896, 902 (7th Cir. 1973). Though more difficult of determination, the same procedure must be followed with respect to each rejected black applicant who demonstrates that his rejection was based on racial discrimination. The awards to rejected applicants must be reduced by their actual earnings after the time of rejection, or amounts earnable with reasonable diligence.
 
 
 42
 The district court directed that back pay run from July 2, 1965, the effective date of Title VII. The limitations period for back-pay awards is not necessarily the effective date of the Act. See United States v. Georgia Power Co., supra, 474 F.2d 922-25. Since neither the majority nor the dissenting opinion in Thornton v. East Texas Motor Freight, 497 F.2d 416 (6th Cir. 1974), cited by plaintiffs, indicates that a statute of limitations was there relied upon by any party, that case does not settle the issue. The defense of limitations was pled in the present case and must be considered. Compare United States v. Masonry Contractors Ass'n, supra. The 1972 amendment to Title VII included a statute of limitations. Pub.L. 92-261, § 4(a). Prior to this amendment, the period of limitations in a Title VII action was determined by applying the most analogous statute of limitations of the state where the action was filed. The present action was filed before the effective date of the amendment.
 
 
 43
 In Marlowe v. Fisher Body, 489 F.2d 1057, 1063 (6th Cir. 1973), which also arose in Michigan, we determined that the most analogous Michigan statute of limitation was Michigan Compiled Laws (M.C.L.) § 600.5805(7) which applies to "action to recover damages for injuries to persons or property." The action in Marlowe was brought under 42 U.S.C. § 1981. We believe that the same limitations period of three years applies to this action which was brought under Title VII and Section 1981. The deprivation of civil rights is a wrong to the person. Subsection 7 of M.C.L. § 600.5805 most appropriately deals with an action to vindicate the right of employees to be free of discrimination. Marlowe v. Fisher Body, supra ; cf. Madison v. Wood, 410 F.2d 564 (6th Cir. 1969).
 
 
 44
 Although this court has held that the filing of a complaint with the Equal Employment Opportunity Commission does not toll limitations for an action under Section 1981, Johnson v. Railway Express Agency, Inc., 489 F.2d 525, 529 (6th Cir. 1973), we believe that it does toll the statute for an action brought under Title VII. United States v. Georgia Power Co., supra, 474 F.2d at 925. In this case, the plaintiff Willie Stamps presented a charge to EEOC on January 11, 1971. (The document was stamped "Received" on that date, though it was not marked "Filed" until March 8, 1971 after referral to the Michigan Civil Rights Commission.) The filing by Stamps tolled the statute of limitations for all members of the class he represented. Limitations were tolled for rejected applicants by the filing of the government complaint on June 22, 1972. An individual employee who was unlawfully denied advancement between January 11, 1968 and the date of the district court decree, March 22, 1974; and a rejected applicant who was unlawfully refused employment between June 22, 1969 and March 22, 1974, will be entitled to an award of back pay from the time of such unlawful act. Meadows v. Ford Motor Co., 510 F.2d 939 (6th Cir. 1975). It must again be pointed out that employees and rejected applicants alike must prove their entitlement to back pay. As the Supreme Court stated in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973), this burden is met in the following manner:
 
 
 45
 The complainant in a Title VII trial must carry the initial burden under the statute of establishing a prima facie case of racial discrimination. This may be done by showing (i) that he belongs to a racial minority; (ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected; and (iv) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications. (footnote omitted.)
 
 
 46
 Requirement (ii) above, may be satisfied by an employee's showing that he indicated a desire to transfer to a vacant job, but did not do so because it would have been futile under existing company practices. Requirement (iv) above, is satisfied if the position was filled by someone possessing the qualifications of the applicant or someone less qualified. Upon these showings back pay will be awarded unless Edison is able to prove that the rejection or failure to transfer was not racially motivated.
 
 C. Seniority and Job Transfer
 
 47
 This court is committed to the "rightful place" theory of seniority enunciated by the Fifth Circuit in United Papermakers & Paperworkers v. United States, 416 F.2d 980 (5th Cir., 1969), cert. denied, 397 U.S. 919, 90 S.Ct. 926, 25 L.Ed.2d 100 (1970). See both opinions in Thornton v. East Texas Motor Freight, supra. The manner in which the rightful place theory is applied is set forth in Papermakers as follows:
 
 
 48
 The Act should be construed to prohibit the future awarding of vacant jobs on the basis of a seniority system that "locks in" prior racial classification. White incumbent workers should not be bumped out of their present positions by Negroes with greater plant seniority; plant seniority should be asserted only with respect to new job openings. This solution accords with the purpose and history of the legislation. 416 F.2d at 988 (emphasis in original).
 
 
 49
 Under the rightful place theory, in the context of this case where the previous system worked so strongly against transfers for blacks, new seniority (though not back pay) should be available regardless of whether an employee actually sought a transfer previously. See Thornton v. East Texas Motor Freight, supra, 497 F.2d at 428-29 (dissenting opinion of Phillips, C. J.).
 
 
 50
 The district court properly directed that plant-wide seniority be accorded all black employees of Edison, based on time actually worked, for the purpose of permitting transfer to high-opportunity jobs without loss of seniority or reduction in pay. Permitting black employees to transfer and advance and generally to receive the benefits of plant-wide seniority rather than being limited to departmental or job seniority does not violate Section 703(h) of the Act, 42 U.S.C. § 2000e-2(h), which permits an employer to maintain different terms of employment pursuant to a bona fide seniority system. Departmental or job seniority rooted in racial discrimination is not bona fide seniority. However, in awarding retroactive seniority to rejected black applicants and those to be hired in the future, the district court went beyond the prayer for relief in the government complaint. Since rejected applicants were not members of the class represented by the private plaintiffs the relief afforded them is limited to that sought on their behalf by the United States. The government did not ask for such seniority in its complaint, and there is no provision for it in the requested findings which the government submitted to the district court and which contained five items of "Necessary and Appropriate Relief." Upon remand, the seniority provisions of the decree will be altered to grant plant-wide seniority to black employees only for the time of their actual employment by Edison. There is no conflict between this holding and that of the court in Meadows v. Ford Motor Co., 510 F.2d 939 (6th Cir., 1975). In Meadows, the only named plaintiff was a rejected applicant and the class she represented consisted solely of rejected applicants. Retroactive seniority was part of the relief sought.
 
 D. Conclusion
 
 51
 A number of the provisions of the district court order must be rewritten. Specifically, the preamble to the ORDER, which begins at page 62 of the OPINION AND ORDER filed October 2, 1973, must be modified to limit the class represented by plaintiffs as indicated herein. The same modification must be made to paragraph 2 of the order. Paragraph 3 must be redrafted to require notice to rejected and former employees only and to extend priority to rejected applicants only for new vacancies. Paragraph 4 is approved, with its application limited to actual employees. In paragraph 6, the fourth from the last word should be changed to read "from" rather than "for." Paragraphs 7 and 8 must be restated in accord with the rulings, supra, on the back-pay issue. Paragraph 12 must be modified to make its provisions subject to the availability of qualified applicants and to provide a time or maximum percentage at which this obligation ceases. Paragraph 19 of the order shall be deleted in its entirety.
 
 
 52
 The remaining provisions of the decree are approved. Affirmative action may include the imposition of hiring quotas and the requirement of periodic reporting of progress under the decree. United States v. Masonry Contractors Ass'n, supra, 497 F.2d at 877. The provisions granting specific relief to the plaintiffs Stamps and Atkinson are within the discretion of the trial court. The prohibition against use of tests which have not been validated according to EEOC guidelines is likewise reasonable. The district court provided in its order for establishment of a committee "to resolve differences and disputes that may arise under this decree." To the extent this committee is intended to serve in an advisory capacity, it is approved. However, the actual resolution of disputes under the decree is a judicial function which may not be delegated to such a committee.
 
 
 53
 The judgment of the district court is reversed and the case is remanded for further proceedings in accordance with this opinion, including the setting and allocation of attorneys fees. Each party will pay its own costs on this appeal.
 
 
 
 [1]
 The Equal Employment Opportunity Commission was substituted for the United States of America as plaintiff in the government action