Mary Jo SEEP, et al., Plaintiffs,

v.

COMMERCIAL MOTOR FREIGHT, INC., et al., Defendants.

No. C–1–75–440.

United States District Court, S.D. Ohio, W.D.

Dec. 7, 1983.

Paul H. Tobias, Cincinnati, Ohio, for plaintiffs.

Joseph H. Vahlsing, Cincinnati, Ohio, Sorrell Logothetis, Dayton, Ohio, for defendants.

## FINDINGS OF FACT, OPINION AND CONCLUSIONS OF LAW

CARL B. RUBIN, Chief Judge.

This matter is before the Court following trial for a period of nine days, the presentation of evidence and testimony by 20 witnesses.[1] Plaintiffs have brought this action pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* They assert discrimination in employment by defendant Commercial Lovelace Motor Freight ("Commercial") by reason of sex and they assert further a failure of fair representation by defendant Local 100 of the Teamsters, Chauffeurs, Warehousemen and Helpers Union of America (Local 100) and the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America ("Teamsters"). They also assert discrimination on the basis of sex by defendants Local 100 and Teamsters, in violation of Title VII. Pursuant to Rule 52 of the Federal Rules of Civil Proce-

dure, the Court does submit herewith its Findings of Fact, Opinion and Conclusions of Law.

### I. Findings of Fact

(1) *The Parties:*

The plaintiffs in this matter are Mary Jo Seep, Jackie Tensing, Karen Fields, Kathleen Holly, Wellard Aufranc, Joyce Bach, Gertrude Furkin, Paul Heck, Patricia Howard, Harry Tinney, Terry Kunkel, Kathleen Larbes, Judith Masterson, Ruby Pennington, Raymond Thomas, Sarah Wallace and Roy Wendling. All of the plaintiffs are now or have been employed by the defendant Commercial Lovelace Motor Freight as clerical workers in its office. The defendant Commercial Lovelace Motor Freight is a commercial trucking company with headquarters in Cincinnati, Ohio. During the times involved in this action, it was known as Commercial Motor Freight and, subsequently, as Commercial Lovelace. Defendant Local 100 and defendant Teamsters are labor organizations as defined in 42 U.S.C. § 2000e *et seq.* Local 100 is the bargaining agent for the clerical unit to which the plaintiffs have belonged.

(2) *Representation:*

At all times involved in this litigation, the employees of the Commercial Cincinnati terminal were members of three separate bargaining units represented by Local 100. One unit consists of long-haul or "over-the-road" drivers. A second unit consists of short-haul or "city" drivers as well as dock workers whose basic function it is to load and unload the trucks at that Cincinnati terminal. Combined, these units contain over 100 members. At no time have these units contained any female members.

A third unit consisting of approximately 15 members represents the office clerical workers at the Cincinnati terminal. Plaintiffs are now or have been members of this unit. This unit is composed predominantly

---

**1.** Two witnesses, Mary Jo Seep and Burlin Davis, testified twice, one witness, Warren Dillon, testified three times.

of females although there are some male members.

A fourth group of employees is represented by the International Association of Machinists and Aerospace Workers (IAM). They service and repair the trucks at the Cincinnati terminal. They are not parties to this action and their conduct has no bearing upon this outcome.

### (3) *Collective Bargaining Agreements:*

Collective Bargaining Agreements are customarily negotiated for a three-year period. They have provided in the past three separate scales of wages; one scale for truck drivers, a second for dock workers and a third for clerical workers. At all times, the scale for dock workers has been in excess of that for clerical workers. The Collective Bargaining Agreements for the truck drivers and dock workers expire at a different time from the Collective Bargaining Agreement for the clerical workers. Seniority is accumulated within each unit. For purposes of lay-off or promotion, seniority is not transferrable from one unit to the other. Seniority for purposes of total company employment is transferrable.

### (4) *Discrimination Charges:*

In March and April, 1973, plaintiffs filed charges of discrimination with the Equal Employment Opportunities Commission asserting violations of Title VII of the Civil Rights Act of 1964. Against Local 100 and Teamsters International, plaintiffs assert both claims under Title VII and a failure of fair representation.

### (5) *The Jack Wise Issue:*

It has been previously asserted by plaintiffs that office clerical work was improperly assigned to one Jack Wise who was a member of the dock unit. A grievance was filed over this assignment and processed through the grievance procedure and through arbitration. An arbitrator deter-

mined (Ex. C–I) that the work performed by Mr. Wise was not in violation of the Collective Bargaining Agreement or of plaintiffs' rights thereunder.[2] This issue, having been arbitrated to a conclusion, will be deemed closed and not considered by the Court.

### (6) *Transfer to Dock Workers Unit:*

By ridicule and harassment, plaintiffs were discouraged from transferring to the dock workers unit. Supervisory employees asserted fictitious requirements of females seeking to qualify that were not required of males. At no time has any female been employed by or permitted to transfer to the dock workers unit.

At times when the company had openings for truck drivers, employees were permitted to use company's equipment on Saturdays in order to qualify for such jobs. The company required that the employee obtain a qualified instructor, be 21 years of age, possess a chauffeur's license and be able to pass a physical examination by the United States Department of Transportation. No female employee ever received such training.

Prior to 1977, no female was ever employed as a dispatcher, sales representative, rate clerk or supervisor.

### (7) *Sexual Harassment:*

Some evidence was presented of suggestive remarks made to female employees, the possession and display of possible pornographic material by male employees and attempts at embarrassment of female employees. At no time was any such incident made the subject of a grievance.

### (8) *1973 Contract:*

Difficulties were encountered in negotiating a three-year contract for the period 1973–1976. This contract was not signed until July of 1974. It was made retroactive

---

**2.** An appeal from the arbitrator's ruling was taken to this Court in *Truck Drivers, Chauffeurs and Helpers Local Union No. 100 v. Commercial Lovelace Motor Freight, Inc.* (No. C–1–78–354).

On January 9, 1979, the arbitrator's award was affirmed and defendant's Motion for Summary Judgment was granted.

to October, 1973. In May of 1974, an official of Local 100 declined to seek strike sanctions from the International Union.[3] Evidence was presented that the president of Local 100 signed a contract without authorization or ratification by the office worker clerical unit.

#### (9) *1976 Contract:*

In 1976, Local 100 obtained a lawyer to represent the office clerical workers in negotiations concerning the 1976–1979 contract. Some of plaintiffs prepared a proposal by combining portions of clerical contracts with other companies and in other areas of the United States. A contract was negotiated and a meeting of the local union was called to ratify such contract. Evidence was presented that representatives of Local 100 threatened that if the contract were not accepted, the Union cards of the unit members would be withdrawn. This contract was accepted under duress.

#### (10) *1979 Contract:*

The contract for the period beginning in 1979 was recommended by the bargaining committee of Local 100 and accepted and signed without protest.

### II. Opinion

#### A. *Title VII:*

Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, was enacted "to assure equality of employment opportunities and to eliminate ... discriminatory practices and devices." *McDonnell-Douglas Corp. v. Green,* 411 U.S. 792, 800, 93 S.Ct. 1817, 1823, 36 L.Ed.2d 668 (1973). The language and history of the Act emphasize "eliminating discrimination in employment; similarly situated employees are not to be treated differently solely because they differ with respect to race, color, religion, sex, or national origin." *Trans World Airlines, Inc. v. Hardison,* 432 U.S. 63, 71, 97 S.Ct. 2264, 2270, 53 L.Ed.2d 113 (1977).

Specifically, 42 U.S.C. § 2000e–2 provides, *inter alia,*

(a) It shall be an unlawful employment practice for an employer—

(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or

(2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin ...

(c) It shall be an unlawful employment practice for a labor organization—

(1) to exclude or to expel from its membership, or otherwise to discriminate against, any individual because of his race, color, religion, sex, or national origin;

(2) to limit, segregate, or classify its membership or applicants for membership, or to classify or fail or refuse to refer for employment any individual, in any way which would deprive or tend to deprive any individual of employment opportunities, or would limit such employment opportunities or otherwise adversely affect his status as an employee or as an applicant for employment, because of such individual's race, color, religion, sex, or national origin; or

(3) to cause or attempt to cause an employer to discriminate against an individual in violation of this section.

Plaintiffs have alleged violations of Title VII by both Commercial and the union defendants, as well as a breach of the duty of fair representation under § 8(b) of the National Labor Relations Act, 29 U.S.C. § 158(b), by the latter. *See Vaca v. Sipes,*

---

**3.** The term "strike sanctions" has been used differently by plaintiffs and union defendants. The Court will use this term to mean an agreement by the International union to pay weekly strike benefits to its members.

386 U.S. 171, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967). The Court will first address the claims against the union defendants.

### B. *Claims Against the Union Defendants:*

Plaintiffs' Title VII and fair representation claims involve essentially the same factual allegations. Plaintiffs' primary assertion involves the union's failure to secure a contract which included plaintiffs' bargaining unit under the National Master Freight Agreement or a supplement thereto. The dock and driving units at Commercial are so included. Plaintiffs' allege that this failure constitutes a breach of the duty of fair representation and, due to the predominantly female membership of plaintiffs' bargaining unit, a violation of 42 U.S.C. § 2000e–2(c). Plaintiffs assert that this failure to be included under the National Master Freight Agreement has resulted in lower wages and less favorable fringe benefits, seniority rights, and transfer privileges, as compared with the all-male units which are so included. Plaintiffs, in addition, assert that the execution of the 1973 contract without ratification by the unit constituted a similar breach of duty and violation of Title VII. Plaintiffs also assert that the union's conduct during the 1972 strike is actionable.

Plaintiffs introduced evidence of other specific incidents which they claim constituted additional violations by the union defendants. In the Court's view, those claims are related to the general allegations above, particularly to the failure to be included under the National Master Freight Agreement. Such inclusion was a continuing goal of plaintiffs throughout the period at issue.

■ At the outset,[4] the Court notes that the same conduct may constitute both a breach of the duty of fair representation and a violation of Title VII. *Farmer v. ARA Services, Inc.,* 660 F.2d 1096, 1104

(6th Cir.1981). Here, however, neither resulted.

■ A breach of the duty of fair representation occurs only when the union's conduct toward members of the bargaining unit is arbitrary, discriminatory, or in bad faith. *Vaca v. Sipes, supra,* 386 U.S. at 190, 87 S.Ct. at 916; *Farmer, supra,* at 1103. Where a union makes a good-faith attempt to represent the rights of its members, it does not breach its duty of fair representation in either the negotiation or acceptance of a contract which does not contain all of the provisions sought by its members. *Johnson v. Air Line Pilots in Service of Northwest Airlines, Inc.,* 650 F.2d 133 (8th Cir.), *cert. denied,* 454 U.S. 1063, 102 S.Ct. 614, 70 L.Ed.2d 601 (1981). The evidence in this case establishes that Local 100 repeatedly raised the issue of coverage under the National Master Freight Agreement, but Commercial refused to agree to such a provision in any collective bargaining agreement with plaintiffs' bargaining unit. Meanwhile, Local 100 was able successfully to negotiate wage increases and other benefits sought by the unit. Under these circumstances, the Court holds that there has been no breach of the duty of fair representation.

Similarly, the Court holds that no failure of fair representation occurred as a result of the signing of the 1973 contract without ratification by the membership of the bargaining unit. There is no requirement that a collective bargaining agreement be submitted to the membership for authorization or ratification, unless such a procedure is expressly mandated by the agreement itself or by the constitution, by-laws, or rules and regulations of the union. *Confederated Independent Unions v. Rockwell Standard Co.,* 465 F.2d 1137 (3rd Cir.1972), *citing Cleveland Orchestra Committee v. Cleveland Federation of Musicians,* 303 F.2d 229 (6th Cir.1962). Here, there was no such requirement of submission for rati-

---

**4.** In light of the Court's conclusion, *infra,* that the union defendants neither violated Title VII nor failed fairly to represent plaintiffs, preliminary procedural and statute of limitations questions need not be addressed. The Court will assume, without deciding, that plaintiffs' claims against the union defendants are timely and that all procedural prerequisites have been met.

fication. Furthermore, the evidence establishes that, three times, the union bargaining committee thought it had reached agreement with Commercial on all of the issues put forth by the membership, only to have the membership make additional demands. Again, under these circumstances, and because the union was not required to submit the contract for ratification, the union's conduct was not arbitrary, discriminatory or in bad faith.

■ Finally, the Court finds no breach of duty as a result of the union's conduct during the 1972 strike. In permitting the dock and driver units to cross plaintiffs' picket line after seven days, the union committed no actionable breach. A union has wide discretion in its representation of a bargaining unit and, if not acting arbitrarily, discriminatorily or in bad faith, will not be held liable simply because some members are disadvantaged by its actions. *Johnson, supra* at 137. *See also Turner v. Air Transport Dispatcher's Association*, 468 F.2d 297, 299 (5th Cir.1972). The principle may be extended to a union's action with respect to different bargaining units within the same local. A union may take action to benefit the local even though the effect is to favor one group over another. *Golden v. Local 55 of the International Association of Firefighters*, 633 F.2d 817, 821 (9th Cir.1980). The evidence supports the union's contention that it was in the best interests of Local 100, as a whole, to permit the dock and driver units, which represented the overwhelming majority of the local's membership at Commercial, to return to work after supporting plaintiffs' strike for a week. The union action does not constitute a failure of fair representation.

■ With respect to other alleged instances of failure of fair representation, the Court, upon examination, finds no basis for liability. While it is clear that plaintiffs were frequently dissatisfied with the outcome of contract negotiations, particularly with respect to the issue of the National Master Freight Agreement, and while it is equally clear that relations between plain-

tiffs and the union's representatives were often strained, it is also clear that these shortcomings did not rise to the level of arbitrary, discriminatory or bad faith conduct. Accordingly, the Court holds that the union defendants did not at any time breach their duty of fair representation.

■ Similarly, the Court holds that the conduct of the Teamsters and Local 100 does not constitute a violation of Title VII. This conclusion follows from the holding that there was no breach of the duty of fair representation, since discriminatory conduct constitutes such a breach. *Vaca v. Sipes, supra.* Specifically, the Court holds that there was no discrimination by the defendants against plaintiffs' bargaining unit on the basis of sex.

In those cases where the union took action which had an unfavorable impact on plaintiffs' unit, the Court has already found that it was the size of the unit rather than the gender of its members which influenced the union's decision. Such action was within the permissible scope of the union's discretion. *See Johnson, supra; Turner, supra.* The failure to include plaintiffs' unit under the National Master Freight Agreement was the result of a steadfast refusal by Commercial to agree to any such contract provision. It was not the result of discrimination, sexual or otherwise, by the union defendants. Finally, the Court finds that the differences in wages and benefits between plaintiffs' unit and the dock and driver units resulted from the differing nature of the work performed, not from any sexual discrimination on the part of the union defendants. The bargaining on behalf of the office clerical workers was separate from the bargaining on behalf of the dockmen and drivers. As noted above, the union was able to secure pay increases and other benefits sought by the office unit. While these wage and benefit packages were not the same as those obtained for the dock and driver units, the evidence establishes that the disparity was due to factors other than the sex of the unit membership, factors such as the type of work performed and its relative value in

the eyes of Commercial, the size of the unit and its relative bargaining strength, and the fact that, for reasons discussed above, the office unit was not included under the National Master Freight Agreement.

In sum, the Court holds that the union defendants have neither breached the duty of fair representation nor violated Title VII.

## C. *Claims Against Commercial:*

### 1. Sex Discrimination

Plaintiffs' Title VII claims against Commercial involve numerous allegations of specific instances of sex discrimination. The principal allegations have been set forth in the Final Pre-trial Order prepared by the parties prior to trial. Plaintiffs allege generally that Commercial's practices and policies with respect to "wages, fringe benefits, working conditions, transfers, discipline, promotions, hiring, recruitment, training, filling of job vacancies, job assignment and job classifications" operated to deny plaintiffs equal job opportunity on the basis of their gender. More specifically, they allege that members of the office unit were paid less than male members of the dock unit doing substantially similar work; that members of the office unit were prevented from applying for available jobs in the dock and driver units; that the seniority provisions of the collective bargaining agreements in force during the relevant period were discriminatory; and that the discharge of plaintiff Bach and the earlier reassignments of plaintiffs Bach and Seep were in retaliation for their filing charges with the Equal Employment Opportunity Commission ("EEOC"). Plaintiffs also presented evidence of instances of alleged sexual harassment.

Prior to filing suit in federal court, a Title VII plaintiff must file a charge of discrimination with the EEOC. The charge must be filed within 180 days of the incident on which it is based. 42 U.S.C. § 2000e–5(e).

Recently, the Supreme held that the timely filing of the EEOC charge "is not a jurisdictional prerequisite to suit in federal court, but a requirement that, like a statute of limitations, is subject to waiver, estoppel, and equitable tolling." *Zipes v. Trans World Airlines, Inc.,* 455 U.S. 385, 102 S.Ct. 1127, 71 L.Ed.2d 234 (1982). That view had previously been adopted in this Circuit. *See Morgan v. Washington Manufacturing Co.,* 660 F.2d 710, 712 (6th Cir. 1981).

Here, the Court finds no equitable justification for tolling or otherwise eliminating the 180-day time requirement. The earliest EEOC charge in evidence was filed March 26, 1973, thus establishing a cut-off date of September 26, 1972. Alleged violations of Title VII before that date will not be considered by the Court as claims for which plaintiffs may be granted relief.

However, the EEOC filing requirement will be relaxed in one respect. The Court will consider the claims of those plaintiffs who have not filed separate charges with the EEOC, as long as those claims are similar to those of plaintiffs who have filed. Although the United States Court of Appeals for the Sixth Circuit appears not to have addressed this precise issue, at least two Courts of Appeals have concluded that, where their allegations are similar, every original plaintiff in a multiple-plaintiff, non-class action suit need not file charges with the EEOC. *See Crawford v. United States Steel Corp.,* 660 F.2d 663, 665–66 (5th Cir.1981); *Allen v. Amalgamated Transit Union Local 788,* 554 F.2d 876 (8th Cir.), *cert. denied,* 434 U.S. 891, 98 S.Ct. 266, 54 L.Ed.2d 176 (1977). The Court finds the reasoning in these cases persuasive and holds that the filing requirement has been met here with respect to all plaintiffs.

There are two separate theories under which a Title VII plaintiff may recover. *Grano v. Dept. of Development,* 637 F.2d 1073, 1080 (6th Cir.1980). Under a "disparate impact" theory, the issue is whether facially neutral employment practices fall more harshly on one group than another and cannot be justified by business

necessity. *Id.* at 1081, *citing Teamsters v. United States*, 431 U.S. 324, 335–36 n. 15, 97 S.Ct. 1843, 1854 n. 15, 52 L.Ed.2d 396 (1977). Proof of discriminatory intent is not required under this theory. *Id.*

 Under a "disparate treatment" theory, the inquiry is simply whether the employer treats some people less favorably than others because of their race, color, religion, sex or national origin. *Id.* Proof of discriminatory motive is "critical," although motive may, in some situations, be inferred from the mere fact of disparate treatment. *Id.*

Plaintiffs are relying on a disparate treatment theory, and it is in conformity with that theory, including the intent requirement, that the evidence must be analyzed.

 This analysis must take place within the framework established for Title VII cases in *McDonnell-Douglas Corp. v. Green, supra.* There, the Supreme Court established a three-stage evidentiary procedure in Title VII cases. Initially, the plaintiff must carry the burden of establishing a prima facie case of discrimination under the statute. Then the burden shifts to the employer "to articulate some legitimate, non-discriminatory reason" for the challenged action.[5] Finally, the plaintiff must be given a fair opportunity to demonstrate that the reason advanced by the employer was in fact pretextual. *Id.* 411 U.S. at 802–804, 93 S.Ct. at 1824–25.

Plaintiffs have amply established a prima facie case of sex discrimination. They have shown that the office clerical workers at Commercial were predominantly female and that the dock workers and drivers were, without exception, male. They have established that a disparity as to wages and other conditions of employment existed between the office workers, on the one hand, and the dockmen and drivers, on the

other, including those dockmen who performed work of a clerical nature. They have established that members of the office unit were discouraged from bidding for available dock jobs and denied the opportunity to train for available driving jobs, with the result that no member of the office unit has ever been able to transfer into the dock and driving units. They have established that the seniority provisions of the applicable collective bargaining agreements worked to the disfavor of an employee transferring from one unit to another. Finally, they have established a prima facie case in support of the allegations that plaintiffs Seep and Bach were victims of retaliation after filing EEOC charges.[6]

2. Sexual Harassment

 The Court holds that plaintiffs have not established a prima facie case with respect to their allegations of sexual harassment. While there was some evidence presented of suggestive or embarrassing remarks directed toward the women in the office unit, the Court holds that this behavior did not rise to the level of discrimination with respect to conditions of employment contemplated by Title VII. While there are, unquestionably, situations in which harassment alone may constitute a violation of Title VII, *see, e.g., Robson v. Eva's Super Market, Inc.,* 538 F.Supp. 857 (N.D.Ohio 1982) (sexual harassment); *EEOC v. Murphy Motor Freight Lines, Inc.,* 488 F.Supp. 381 (D.Minn.1980) (racial harassment); *Compston v. Borden,* 424 F.Supp. 157 (S.D.Ohio 1976) (religious harassment), the evidence in this case does not demonstrate the existence of sexual harassment "sufficiently severe and persistent to affect seriously the psychological well being of employees." *Henson v. City of Dundee,* 682 F.2d 897, 904 (11th Cir. 1982). On this issue, plaintiffs have failed to establish a prima facie case.

---

**5.** The Supreme Court has emphasized that the employer need not prove the absence of discriminatory motive, but, rather, need only *articulate* a non-discriminatory reason. *Board of Trustees of Keene State College v. Sweeney,* 439

U.S. 24, 99 S.Ct. 295, 58 L.Ed.2d 216 (1978). *See also Grano, supra,* at 1080.

**6.** Such retaliation, if proved, would constitute a violation of 42 U.S.C. § 2000e–3(a).

■ Proceeding through the *McDonnell-Douglas* analysis, the Court holds that Commercial has met its second-stage burden with respect to the disparity in wages and other conditions of employment between the office workers and the dockmen and drivers, with respect to the seniority provisions at issue, and with respect to the alleged retaliation against plaintiffs Seep and Bach for filing EEOC charges.[7]

Commercial presented evidence that the disparity in wages and other conditions of employment between the office workers and the dockmen and drivers was due to differences in the type of work performed, and not to differences in gender. The office workers and the dockmen and drivers were not "similarly situated employees," *Trans World Airlines, Inc. v. Hardison, supra,* and different treatment was therefore permissible if not based solely on sex or some other invalid criterion. *Id.* The fact that a few dockmen at times performed clerical work does not alter this conclusion. The number of dockmen involved was minimal, and even those performing clerical work could be required to load and unload freight. Under these circumstances, the disparity in wages and other conditions of employment between the units was not a violation of Title VII.

### 3. Seniority System

■ The seniority system in effect during the period at issue was likewise not a violation of Title VII. The evidence established that unit-wide seniority was the rule for all units, not just the office unit. The law is clear that, absent a discriminatory purpose, "the operation of a seniority system cannot be an unlawful employment practice even if the system has some discriminatory consequences." *Trans World Airlines, Inc. v. Hardison, supra,* 432 U.S. at 82, 97 S.Ct. at 2275. *See also* 42 U.S.C.

§ 2000e-2(h). The evidence of both the union and the company was sufficient to establish that the seniority system was neither devised nor operated with a discriminatory purpose. This evidence was not rebutted, and the Court holds that the operation of the seniority system did not violate Title VII.

■ Commercial also presented evidence that the job reassignments of plaintiffs Seep and Bach, and the later discharge of plaintiff Bach were not in retaliation for the filing of EEOC charges by those plaintiffs. The reassignment of both plaintiffs took place when their former jobs were abolished. The evidence supports defendant's contention that the decision to abolish those jobs was made for economic reasons, due to a slowdown in business. This evidence was not convincingly rebutted. Similarly, the evidence establishes that the discharge of plaintiff Bach was due to unsatisfactory job performance on her part (see Exhibit C–F) and was unrelated to her filing an EEOC charge. The Court holds that the reassignments and discharge did not violate Title VII.

### 4. Job Bidding

■ The Court does, however, find a violation of Title VII in connection with Commercial's activities in discouraging female members of the office unit from bidding for jobs in the dock unit and in preventing female members of the office unit who were qualified to do so from training for a driving position.[8] Commercial was unable to articulate a legitimate, non-discriminatory reason for the ridicule and harassment encountered by members of the office unit who expressed an interest in bidding for dock jobs. Commercial was also unable to articulate any such reason for the fact that supervisory employees invented fictitious requirements which

---

**7.** Plaintiffs presented very little rebuttal, relying instead on the evidence in their prima facie case. Consequently, the Court's decision will turn, in effect, on the strength of plaintiffs' prima facie case and Commercial's evidence of non-discriminatory motive.

**8.** The Court emphasizes that the practices involved here are distinct from the issue of the seniority system which, while having a discouraging effect on inter-unit transfers, has been held not violative of Title VII.

were imposed upon women seeking to transfer to the dock unit but not upon men. (Finding of Fact 6). The evidence establishes that plaintiffs were treated in this manner because they are women. This is precisely the kind of discrimination and deprivation of employment opportunity which Title VII prohibits. The Court holds that Commercial violated Title VII by permitting its supervisory personnel to discourage and, in effect, prevent plaintiffs from bidding on dock jobs, through ridicule, harassment and the invention of fictitious requirements not imposed on male employees. The Court further holds that Commercial violated Title VII by preventing those plaintiffs who were otherwise qualified from training for a driving position. Here again, the evidence establishes that Commercial's actions were based on the gender of the plaintiffs who expressed an interest in the training, and Commercial has not met its burden of advancing any valid reason for its conduct.

### D. *Remedy*

#### 1. Backpay

■ Having determined that Commercial violated Title VII, the Court must now fashion an appropriate remedy. The statute authorizes injunctive relief together with "such affirmative action as may be appropriate," including, but not limited to, reinstatement or hiring, with or without back pay. 42 U.S.C. § 2000e–5(g). Although the nature of any relief granted is left to the sound discretion of the trial court, back pay should, as a general rule, be awarded. *Albermarle Paper Co. v. Moody*, 422 U.S. 405, 417–22, 95 S.Ct. 2362, 2371–73, 45 L.Ed.2d 280 (1975); *Head v. Timken Roller Bearing Co.*, 486 F.2d 870, 876 (6th Cir.1973). In the words of the Supreme Court, back pay should be denied "only for reasons which, if applied generally, would not frustrate the central statutory purposes of eradicating discrimination ... and making persons whole for injuries suffered through past discrimination." *Albermarle Paper, supra,* 422 U.S. at 421, 95 S.Ct. at 2373. Mindful of these standards,

the Court nevertheless concludes that back pay awards must be limited in this case.

■ Only three plaintiffs testified that they expressed an interest in bidding for a dock job. Of these, two, Wellard Aufranc and Wayne Pierson, are white males and therefore not entitled to relief pursuant to Title VII under the facts of this case. The third, Judith Masterson, never actually bid on any job outside the office unit, and there is no evidence that any such bid would have been successful. However, any doubts in a situation such as this must be resolved against the discriminating employer. *Kamberos v. GTE Automatic Electric, Inc.*, 603 F.2d 598, 603 n. 6 (7th Cir.1979); *EEOC v. Enterprise Association Steamfitters*, 542 F.2d 579, 587 (2nd Cir.1976), *cert. denied*, 430 U.S. 911, 97 S.Ct. 1186, 51 L.Ed.2d 588 (1977); *United States v. United States Steel Corp.*, 520 F.2d 1043, 1050 (5th Cir.1975), *cert. denied*, 429 U.S. 817, 97 S.Ct. 61, 50 L.Ed.2d 77 (1976); *Hairston v. McLean Trucking Co.*, 520 F.2d 226, 233 (4th Cir.1975). Consequently, the Court concludes that plaintiff Masterson is entitled to back pay for the period from January 1, 1977, the approximate date on which she first expressed her interest in advancement to supervisory personnel, until the date in August, 1981, on which she left Commercial. The amount awarded will be the difference between her salary during that period and the salary of a dock worker during the same period based on the minimum hourly rate for dock workers, plus interest subject, however, to the conditions set forth in Section 2 hereof entitled "Limitation."

■ Similarly, only three plaintiffs, Karen Fields, Kathleen Holly and Joyce Bach, testified that they had expressed an interest in a driver's position. Here again, there are uncertainties involved in the computation of back pay. Nevertheless, resolving doubts against Commercial, the Court makes the following awards: Karen Fields is entitled to back pay from October 4, 1976, the date on which the first notice of driver training was posted, until the present. Such back pay is to be the difference between her salary during that period

and the salary of a city driver during the same period, based on the minimum hourly wage for city drivers during that period, plus interest. Plaintiff Fields is to continue to receive pay at that rate until she has had an opportunity to train and test for a driving position.

Kathleen Holly only worked at Commercial for a period of eight or nine months, beginning in July, 1974. It is not clear when she first expressed interest in a driving job. The Court awards her back pay for the entire period of her employment, to be calculated in the same manner as for plaintiff Fields. The foregoing is subject, however, to the conditions set forth in Section 2 hereof entitled "Limitation."

Joyce Bach first expressed an interest in a driving job sometime in 1973. The Court awards her back pay from January 1, 1973, until August 6, 1973, the effective date of her discharge. The amount of her back pay is to be calculated in the same manner as for plaintiff Fields.[9] The foregoing is subject, however, to the conditions set forth in Section 2 hereof entitled "Limitation."

## 2. Limitation

■■■ The term "back pay" as used in this opinion is intended to be a limited one. The Court will assume that in the absence of discrimination, each of the above plaintiffs would have successfully transferred to the job sought. Such plaintiff would be credited with such seniority to that date as was transferrable. (See Finding of Fact 3). "Back pay" therefore is conditioned upon the realities of the job at that time. A subsequent layoff, for example, that would have reached a person with the seniority of a specific plaintiff would remove the obligation from the defendant for paying "back pay" during the period that a person with such seniority would be laid off.

Presumably, an employee could "bump back" but that would only affect this award if the "bumped back" position paid more than that employee actually received.

## 3. Injunction

■■■ Commercial, furthermore, is hereby permanently enjoined from discriminating against any individual with respect to compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin, and from engaging in any other unlawful employment practices violative of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*

## III. Conclusions of Law

(A) This Court has jurisdiction pursuant to 42 U.S.C. § 2000e–5.

(B) Defendant Local 100 of the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America neither violated Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.;* nor breached a duty of fair representation under 29 U.S.C. § 158(b).

(C) Defendant International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America neither violated Title VII nor breached a duty of fair representation.

(D) The disparity in wages and other conditions of employment between the office unit and the dock and driver units did not constitute a violation of Title VII.

(E) The seniority system in operation at defendant Commercial Lovelace Motor Freight did not constitute a violation of Title VII.

(F) The job reassignments of plaintiffs Seep and Bach and the subsequent dismissal of plaintiff Bach did not constitute violations of Title VII.

(G) Defendant Commercial Lovelace Motor Freight's activities in discouraging female members of the office unit from bidding on jobs in the dock unit and in preventing female members of the unit who were qualified to do so from training for a driving position constituted a violation of Title VII.

(H) In accordance with the foregoing, plaintiffs Masterson, Fields, Holly and

---

**9.** The Court is aware that the award of a specific dollar amount would be desirable. However, having specified the method of calculation, the Court has confidence that the parties can perform the arithmetic, using numbers more readily available to them.

Bach are entitled to back pay as set forth above.

(I) In accordance with the foregoing, defendant Commercial Lovelace Motor Freight is permanently enjoined from discriminating against any individual with respect to compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin, and from engaging in any other unlawful employment practices violative of Title VII.

IT IS SO ORDERED.